**Document 035**

# Cardin Initial Disclosures

*Case No. 19-1646 (November 20, 2020)*



**DEPARTMENT OF THE AIR FORCE**
AIR FORCE OFFICE OF SPECIAL INVESTIGATIONS

# Report of Investigation

**REPORT BY:** SA MICHAEL B. TINNELL  **FILE NO:** 303-C-128-B--33977181031354

**PERIOD OF REPORT:** 13 Apr 18 - 24 Jul 18  **DATE OF REPORT:** 13 Aug 18

**SUBJECT:** ERIK JERALD CARDIN; Male Born: ▓▓▓ Illinois; E-8; SSN: ▓▓▓
615th Contingency Response Wing, AMC, Travis AFB, CA

**VICTIM:** LEAH MARIE OLSZEWSKI; Female Born: ▓▓▓; Pennsylvania; O-4;
SSN: ▓▓▓; 20th Special Forces Group, Alabama National Guard, AL

| MATTERS INVESTIGATED | | | |
|---|---|---|---|
| **INCIDENT** | **OFFENSE DESCRIPTION** | **SUBJECT** | **VICTIM** |
| 2M2068QN | ASSAULT: BY BATTERY | ERIK J. CARDIN | LEAH M. OLSZEWSKI |
| 2M2068QN | KILLING AN UNBORN CHILD | ERIK J. CARDIN | LEAH M. OLSZEWSKI |

**STATUS:** Referred for Action. Action Authority or designee must report to AFOSI all dispositions on investigated offenses and specifications (AFI 71-101, Volume 1).

FOR THE COMMANDER

Digitally signed by
ARMENTA.PHILLIP.RAY.1236788888
Date: 2018.08.13 10:38:08 -07'00'

PHILLIP ARMENTA, SA, USAF
Superintendent, AFOSI DET 303

**DISTRIBUTION:**

| | |
|---|---|
| 821 CRS/CC (Action) (w/ Exhibits) .................................................................................................. | 1 |
| 60 AMW/CC (info) (w/o Exhibits) ................................................................................................... | 1 |
| 60 AMW/SJA (Info) (w/ Exhibits) ................................................................................................... | 1 |
| File (w/ Exhibits) ............................................................................................................................... | 1 |

**SPECIAL HANDLING REQUIRED:** This document is subject to a claim of privilege under military law. Handle in accordance with AFI 71-101, Volume 1.

FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE


*33977181031354*



File No: 303-C-128-B--33977181031354

## TABLE OF CONTENTS

| | |
|---|---|
| SUMMARY OF INVESTIGATION | |
| ELEMENTS OF PROOF | 1-1 |
| INVESTIGATIVE ACTIVITIES | 2-1 |
| EXHIBITS | 3-1 |
| EVIDENCE | 4-1 |



File No: 303-C-128-B--33977181031354

## SUMMARY OF INVESTIGATION

This investigation was initiated on 12 Apr 18, based upon information from Maj LEAH OLSZEWSKI (VICTIM), 20th Special Forces Group, Alabama Army National Guard, AL, who stated SMSgt ERIK CARDIN (SUBJECT), 615th Contingency Response Wing, Travis AFB (TAFB), CA, caused her to miscarry her pregnancy due to physical assault.

VICTIM disclosed she discovered she was pregnant on 1 Oct 17, via an at-home test. On 11 Oct 17, she argued with SUBJECT causing SUBJECT to refuse to speak to her. VICTIM went to the bed in which SUBJECT slept. SUBJECT climbed in the bed and physically kicked VICTIM out of the bed. VICTIM told SUBJECT she was pregnant and that she wanted him to leave. SUBJECT left the residence. Vacaville Police Department (VPD) responded to VICTIM's hang-up call to 911. VICTIM declined to press charges. SUBJECT was questioned, declined assaulting VICTIM, and released. VICTIM believed she miscarried; however, she never sought medical treatment. VICTIM told TSgt LUKE HOLWAY (SUBJECT's friend), 571st Mobility Support Advisory Squadron, TAFB, CA, Security Forces Office of Investigations (SFOI), 60th Security Forces Squadron, TAFB, CA, and 1LT VALERIE MARTINEZ, Family Advocacy Program (FAP), 60th Medical Operation Squadron, TAFB, CA about the miscarriage.

Reviews of SFS documentation disclosed VICTIM met with SFOI and made a statement regarding emotional and physical abuse. There was no mention of a pregnancy or miscarriage.

Reviews of VPD documentation and body cam footage disclosed VICTIM called 911 during an altercation with SUBJECT on 11 Oct 17. VICTIM declined to press charges and only revealed she had scratches and a bruise on her arm. VICTIM did not inform VPD about a pregnancy or miscarriage.

Reviews of recordings, provided by VICTIM, SUBJECT stated to VICTIM, "Are you fucking little Ms. fucking wanna be a man, because if you wanna be a man I'll knock your fucking front teeth out. If you wanna step up to me like a man I'll knock your fucking front teeth out."

SUBJECT waived his Article 31 rights, and disclosed he and VICTIM had intercourse approximately twice after April 2017, but declined to provide details. SUBJECT declined to provide details regarding 11 Oct 17. SUBJECT found out VICTIM stated she had a miscarriage from HOLWAY. SUBJECT reported the information to FAP. SUBJECT did not believe VICTIM had been pregnant, nor had a miscarriage.

HOLWAY disclosed VICTIM informed her she had a miscarriage after SUBJECT left her on 11 Oct 17. HOLWAY asked VICTIM if SUBJECT had done anything illegal, which VICTIM responded he had not.

MARTINEZ disclosed during one of her counseling sessions with SUBJECT, he reported VICTIM was saying she had a miscarriage. MARTINEZ asked VICTIM about the miscarriage in a session with her, which VICTIM responded a miscarriage occurred, but declined to provide details.

Reviews of text messages, provided by SUBJECT, disclosed VICTIM texted "And the baby…i wont forget." No further context was available.

Reviews of all other documentation obtained during this investigation disclosed no information regarding a miscarriage. Record checks of SUBJECT and VICTIM disclosed nothing pertinent to this investigation.



File No: 303-C-128-B--33977181031354

## 1-1. ELEMENTS OF PROOF

| ASSAULT: BY BATTERY | Referenced Paragraph Number |
|---|---|
| That the accused did bodily harm to a certain person; and | 2-7, 2-8, 2-18 |
| That the bodily harm was done with unlawful force or violence. | 2-7, 2-8, 2-18 |

| KILLING AN UNBORN CHILD | Referenced Paragraph Number |
|---|---|
| Any person subject to this chapter who engages in conduct that violates any of the provisions of law and thereby causes the death of, or bodily injury to, a child, who is in utero at the time the conduct takes place. | |



File No:  303-C-128-B--33977181031354

## INVESTIGATIVE ACTIVITIES

2-1. This investigation was initiated on 12 Apr 18, based upon information from Maj LEAH OLSZEWSKI (VICTIM), 20th Special Forces Group, Alabama Army National Guard, AL, who stated SMSgt ERIK CARDIN (SUBJECT), 615th Contingency Response Wing, Travis AFB (TAFB), CA, caused her to miscarry her pregnancy due to physical assault.

2-2. On 13 Apr 18, SA MICHAEL TINNELL, AFOSI Det 303, TAFB, CA, briefed Capt RYAN MCILROY, Chief of Military Justice, 60th Air Mobility Wing (AMW), TAFB, CA, on the facts and circumstances of this investigation. MCILROY provided the following documents to AFOSI, which VICTIM provided to him: VICTIM's AF IMT 1168, Statement of Suspect/Witness/Complainant, (ref para 2-3), VICTIM's letter to Family Advocacy Program (FAP) (ref para 2-11), three audio recordings created by VICTIM (ref para 2-7), Vacaville Police Department (VPD) case number 17-8155 (ref para 2-9), VICTIM's letter to the Secretary of the Air Force (SECAF) (ref para 2-16), VICTIM's Request for Congressional Inquiry (ref para 2-10), and VPD Supplemental Report (ref para 2-15).

2-3. On 13 Apr 18, SA TINNELL reviewed VICTIM's written statement dated 3 Jan 17 (Exhibit 1), provided to 60th Security Forces Squadrons (SFS), Security Forces Office of Investigations (SFOI), TAFB, CA (Note: The interview occurred on 3 Jan 18, but was incorrectly dated 3 Jan 17). The review disclosed the following information: SUBJECT showed an increase in aggression toward her from mid-2016 until late 2017. Multiple instances ended in SUBJECT becoming angry for reasons VICTIM did not understand. He expressed his anger by yelling at and pushing VICTIM around while throwing objects (Agent Note: VICTIM did not report being hit by any of the thrown objects). On 15 Jun 17, SUBJECT pushed VICTIM into a wall at their residence; SUBJECT held up both of his hands to her face and asked her if she wanted him to strike her with the right or the left. There were no witnesses to any of these incidents. On 11 Oct 17, VICTIM and SUBJECT got into an argument ending with SUBJECT kicking her in the stomach. On 11 Nov 17, VICTIM went to David Grant Medical Center (DGMC), TAFB, CA, for depression. A 45 day no contact order was issued by SUBJECT's leadership. VICTIM reported SUBJECT never hit her nor did he ever force her to do anything against her will.

2-4. On 16 Apr 18, SA TINNELL conducted a record check of SUBJECT and VICTIM in AFOSI Investigative Information Management System (I2MS). The review disclosed no record on file.

2-5. On 18 Apr 18, SA TINNELL coordinated with the AFOSI Investigation, Collections, Operations NEXUS (ICON), Marine Corps Base Quantico (MCBQ), VA, to conduct law enforcement record checks of SUBJECT and VICTIM in AFOSI Classified Information Management System (CI2MS), National Crime Information Center (NCIC), and Defense Central Index of Investigations (DCII). The review disclosed no records on file.

2-6. On 18 Apr 18, INV TREY DUTCHER, AFOSI Det 303, TAFB, CA, conducted law enforcement record checks of SUBJECT and VICTIM in the Security Forces Management Information System (SFMIS) and California Law Enforcement Telecommunication System (CLETS). The review disclosed no records in CLETS. SUBJECT and VICTIM were identified in SFMIS investigation I1712-01V (ref para 2-20).



File No: 303-C-128-B--33977181031354

2-7. On 18 Apr 18, SA TINNELL reviewed three recordings provided by VICTIM to MCILROY. The review encompassed audio recordings labeled "Recording 234 June 15 2017", "Recording 239 June 23 2017", and "Recording 245 September 28 2017".

Recording 234 (2 minutes 34 seconds) detailed a verbal altercation between SUBJECT and VICTIM. During the verbal altercation, SUBJECT stated, "Are you fucking little Ms. fucking wanna be a man, because if you wanna be a man I'll knock your fucking front teeth out. If you wanna step up to me like a man I'll knock your fucking front teeth out."

Recording 239 (32 seconds) and Recording 245 (7 minutes 49 seconds) detailed additional verbal altercations between SUBJECT and VICTIM, but had no more threats of physical violence from SUBJECT to VICTIM.

**2-8. VICTIM INTERVIEW:** On 23 Apr 18, SA JESSICA MATYI and SA NATHANIEL COOPER, AFOSI Det 121, Hurlburt Field (HFLD), FL, interviewed VICTIM at 223 Cody Avenue, HFLD, FL. VICTIM verbally provided the following information: VICTIM first met SUBJECT in July 2016 using the cell phone dating application Tinder. During their first date, SUBJECT told VICTIM he was making a Permanent Change of Station (PCS) to Travis AFB, CA, later that month. VICTIM subsequently visited SUBJECT in California twice before November 2016, followed by a third time for an extended period of time over the Thanksgiving, Christmas, and New Year holidays. During this holiday visit, SUBJECT and VICTIM often argued, although she could not recall what each of their specific arguments were about. During one argument, which VICTIM could not remember the date of, VICTIM left SUBJECT's bedroom to sleep in the living room. SUBJECT subsequently asked her to come back to the bedroom and then told her he was glad she walked away when they argued, as he had been in "physical altercations" with women before. VICTIM could not recall what they argued about that night nor did she ask SUBJECT for any further information about the physical altercations he mentioned.

In April 2017, VICTIM moved to California to live with SUBJECT, as her lease was up in Florida and she worked from home. SUBJECT flew out to Florida to help her make the move and the two drove back to California together. At some point during this trip, VICTIM told SUBJECT he was like Dr. Jekyll and Mr. Hyde, meaning he had two different personalities, which upset SUBJECT because he continued to argue with her or yell at her about various things for the rest of the trip. SUBJECT became angry and yelled at her or called her names approximately every three to four days after. Although SUBJECT verbally berated VICTIM or called her names prior to her move, he never became physical while angry.

On four separate occasions between June 2017 and October 2017, SUBJECT grabbed VICTIM during an argument, although VICTIM could not recall the specific dates or the context of the arguments. Each time, SUBJECT put his hands on VICTIM's biceps or grabbed the front neck area of VICTIM's shirt and pushed or threw her into the wall (Agent Note: VICTIM did not know if any damage was caused to the wall and did not have photographs of the wall). SUBJECT moved his face in close to hers to yell at her during these incidents, causing him to spit on her face. Two of these incidents occurred upstairs at their residence at ▮▮▮▮▮▮▮▮▮▮ where SUBJECT and VICTIM argued in the hallway at the top of the stairs and SUBJECT pushed or threw her into the wall. The other two incidents occurred downstairs in the living area. During one of these four arguments, SUBJECT put his hand on the back of VICTIM's neck and pushed her to the ground, where she landed on her knees. SUBJECT applied pressure by pushing and squeezing her neck, to the point that it was painful for VICTIM. VICTIM never



File No: 303-C-128-B--33977181031354

sought medical care or looked for any bruising or other injuries following these incidents. On 8 Oct 17, SUBJECT and VICTIM went for a bike ride together and SUBJECT became upset by a car that passed them too closely, and then yelled at VICTIM for not riding fast enough that he could catch up to the car to fight with the driver. The following day, 9 Oct 17, SUBJECT and VICTIM went on a run together and SUBJECT became angry at her for slowing down at the same time he did when a car passed. On 10 Oct 17, when SUBJECT returned home from work, he yelled at VICTIM for leaving the windows or door of the house open as it made the house smell like smoke from nearby wildfires.

On 11 Oct 17, SUBJECT and VICTIM were in their residence. SUBJECT was not talking to VICTIM based on the incidents over the previous several days. SUBJECT was in his room on his laptop, when VICTIM went to the doorway and asked if he wanted to start sleeping in the same bed as her again. SUBJECT ignored VICTIM and continued to look at his laptop. VICTIM continued talking to SUBJECT so he picked up his guitar and began to play it, repeatedly turning up the volume on the amplifier so that he could not hear her. VICTIM then left the doorway and went into the spare bedroom where she and SUBJECT normally slept together, although she had been sleeping in the master bedroom for several nights due to their arguments. VICTIM set her iPad on the table next to the bed and pulled up the covers. As she got into bed, SUBJECT ran into the room, jumped over her into the bed, and contorted his body so his legs were facing VICTIM. He then kicked VICTIM's side, between her ribcage and hip, with enough force that she fell out of the bed, landed on her feet, and fell into the bedroom closet doors. SUBJECT then grabbed the comforter off of the spare bed and went back into his room where he lay on the floor and began watching a movie on his laptop. VICTIM went into the room and picked up his laptop to get his attention. SUBJECT stood up and grabbed the laptop out of VICTIM's hands, with his right hand, and pulled her hair with his left hand. SUBJECT pulled VICTIM's hair very hard to the point it was painful and she yelled at him to stop. He then grabbed her phone out of her hands and went into the hallway. VICTIM followed him and observed he was trying to break her phone in half. VICTIM wrestled with SUBJECT to get the phone back and he pushed her to the ground. VICTIM attempted to catch herself with her hands but landed on her side with her face in the carpet. SUBJECT then walked back into the spare bedroom and began to pack his belongings to leave. VICTIM went into the bedroom doorway and told him she was pregnant and that she wanted him to leave. SUBJECT made fun of VICTIM by making faces at her and making a mocking noise while he continued to pack his belongings. SUBJECT also called her a "loser" after she told him she was pregnant. SUBJECT then left the residence in his truck. Sometime during this exchange, VICTIM called 9-1-1 and hung up. An operator then called back and told VICTIM they were dispatching police to the residence.

VPD responded to SUBJECT and VICTIM's residence, although she told them she did not want to get SUBJECT in trouble. VICTIM declined to answer many of their questions and was told they would leave to help someone else. The responding officer also took a picture of VICTIM's arm where she had a bruise from the incident, but did so without VICTIM's consent. The officer did not take any other photographs. Aside from the bruise, VICTIM's knees were scraped from being thrown to the ground, but she did not take any photographs of the injuries and never checked her scalp to see if there were any injuries from SUBJECT pulling her hair.

The afternoon following this incident, VICTIM experienced heavy vaginal bleeding and severe cramping. She bled for approximately three days and then experienced light spotting for the following two weeks. VICTIM believed this was due to a miscarriage of her pregnancy, however, she never sought medical



File No: 303-C-128-B--33977181031354

treatment for this issue. VICTIM expected to begin her menstrual cycle on 13 Sep 17; on 1 Oct 17, when she had not yet started her period, she took an at-home pregnancy test, which indicated she was pregnant.

On 4 Oct 17, she took another at-home pregnancy test, which confirmed the results of the first test. She did not seek any medical tests to confirm the pregnancy prior to the incident on 11 Oct 17. VICTIM did not tell any friends or family about the pregnancy or miscarriage, although she sent a message to SUBJECT's friend, HOLWAY that she would not go to the emergency room because SUBJECT would never visit her there. VICTIM informed INV ALBERT GARLICK, SFOI, 60 SFS, TAFB, CA (ref para 2-20 and ref para 2-21), and 1LT VALERIE MARTINEZ, FAP, 60th Medical Operations Squadron (MDOS), TAFB, CA about the miscarriage (ref para 2-31).

Following the incident on 11 Oct 17, VICTIM did not hear from or see SUBJECT. On 11 Nov 17, SUBJECT sent VICTIM a text message advising her that he was coming to their house to get his things and that she may not want to be there. SUBJECT arrived less than ten minutes later with a moving van, several co-workers, and VPD. SUBJECT removed some of his belongings from the residence, but not everything and told VICTIM he would come back later for the rest of the items. VICTIM subsequently went to DGMC as she was emotionally distressed and was checked in for a three day in-patient treatment program. On 3 Dec 17, VICTIM moved out of the home in Vacaville, CA, and moved back to Navarre, FL. VICTIM did not see or speak to SUBJECT following 11 Nov 17; in approximately January or February 2018, VICTIM sent SUBJECT a text message which stated "I believed in you" but she did not get a response. In addition, VICTIM may have sent SUBJECT an email since 11 Nov 17, but could not specifically recall.

VICTIM did not seek medical attention in California for any medical purposes related to a pregnancy or the loss of one. VICTIM saw medical health providers at the Center for Reproductive Medicine in Mobile, AL, on two occasions prior to moving to California, regarding her gynecological health, but only to assess her ability to have children, and never for any medical treatment. VICTIM was advised due to her age, she would likely have difficulty getting pregnant.

2-9. On 24 Apr 18, SA TINNELL reviewed of VPD Case Number 2017-08155, dated 29 Nov 17 (Exhibit 2). The review disclosed the following information: On the evening of 11 Oct 17, VPD responded to a report of Battery on a Spouse or Cohabitant between SUBJECT and VICTIM at ▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ VPD observed VICTIM had red marks on her arms and a bruise on her arm that appeared to be a couple of days old (captured in body cam footage, ref para 2-9). VICTIM stated she accidently dialed 911 and did not want to press charges against SUBJECT. When VPD pulled SUBJECT's vehicle over (captured in body cam footage, ref para 2-18), he stated VICTIM followed him around the house, verbally harassed him and she refused to let him sleep. SUBJECT packed a few belongings and spend the night with TSgt LUKE HOLWAY, 571st Mobility Support Advisory Squadron, Travis AFB, CA. VICTIM attempted to block his exit. SUBJECT grabbed VICTIM by the shoulder blades and moved her out of the way. SUBJECT denied hitting, slapping, or pulling VICTIM's hair and stated no other physical altercations occurred.

2-10. On 25 Apr 18, SA TINNELL reviewed VICTIM's Request for Congressional Inquiry, dated 28 Jan 18, to JOHN GARAMENDI, California Congressman 3rd District, 412 G Street, Davis, CA (Exhibit 3). The review disclosed the following information: VICTIM listed multiple instances of domestic abuse between September 2016 and October 2017. During that time, SUBJECT grabbed and pushed VICTIM



File No: 303-C-128-B--33977181031354

multiple times, put his hands around her neck until she told him to let go multiple times, kicked her with both feet of the bed, and pulled her hair multiple times. SUBJECT also used non-physical ways of punishing VICTIM to include the silent treatment, bad language, and referring to VICTIM as a "slut, bitch, whore, cheat, hooker." VICTIM's Request for Congressional Inquiry was for Congress to look into TAFB Family Advocacy Program, due to the fact they found against VICTIM for stalking in a Central Registry Board (CRB), and did not find against SUBJECT for domestic violence. (Agent Note: VICTIM did not mention her miscarriage in this request.)

2-11. On 30 Apr 18, SA TINNELL reviewed VICTIM's letter to FAP, TAFB, CA, dated 28 Jan 18 (Exhibit 4). The review disclosed VICTIM requested CIV BRIAN FORTIER, FAP, 60 MDOS, TAFB, CA, review their decisions on the CRB findings from 25 Jan 18. VICTIM inquired why her reports of domestic violence and the miscarriage to MARTINEZ were not documented. VICTIM did not provide details about the miscarriage.

2-12. On 2 May 18, SA TINNELL and SA PATRICK PIERCE, AFOSI Det 303, TAFB, CA, interviewed MSgt JASON MASICLAT, First Sergeant, 821st Contingency Response Squadron (CRS), TAFB, CA, and Lt Col ROBERT KLINE, Commander, 821 CRSS, TAFB, CA, at Building 924, TAFB, CA. MASICLAT and KLINE verbally provided the following information: MASICLAT met SUBJECT and VICTIM on 11 Nov 17, when VICTIM had become upset that SUBJECT was leaving their shared residence in Vacaville, CA. MASICLAT did not converse much with SUBJECT, but he seemed to be handling himself professionally and kept away from VICTIM. VICTIM was visibly distraught, to the point that MASICLAT asked if she would go to DGMC, TAFB, CA, to be evaluated. VICTIM agreed, and she was later checked into a mental health facility due to depression. When SUBJECT was PCA'd to 821 CRSS, he seemed like a fine Senior Non-Commissioned Officer (SNCO). MASICLAT heard from VICTIM that he had been fired from multiple leadership roles, but he had been unable to locate any paperwork or individuals that could back up that claim. KLINE did not know SUBJECT well and had only met him a handful of times due to work related events during 2018. KLINE did not know VICTIM. VICTIM did not mention her miscarriage to MASICLAT or KLINE.

2-13. On 3 May 18, SA TINNELL reviewed SUBJECT Personal Information File (PIF) and Automated Records Management System (ARMS). The review disclosed the following information: A review of the no contact order, dated 14 Nov 17, instructed SUBJECT to not be in contact with VICTIM for 45 days, due to the incident that took place on 11 Nov 17 (Agent Note: On 11 Nov 17, SUBJECT moved out of the residence he shared with VICTIM). SUBJECT's ARMS contained four CRB Incident Determinations (ref para 2-14).

2-14. On 3 May 18, SA TINNELL reviewed four CRB Incident Determinations (Exhibit 5) between SUBJECT and VICTIM. The review disclosed the following information: The CRB Incident Determinations, dated 19 Dec 17 and 25 Jan 18, regarding incident 20180016 for adult physical maltreatment of VICTIM, by SUBJECT, did not meet the criteria for physical maltreatment and did not meet the criteria for entry into the DoD Central Registry database. The CRB Incident Determination, dated 25 Jan 18, regarding incident 20180020 for adult emotional maltreatment of SUBJECT, by VICTIM, met the criteria for emotional maltreatment and entry into the DoD Central Registry database. The CRB Incident Determination, dated 25 Jan 18, regarding incident 20180020 for adult emotional maltreatment of VICTIM, by SUBJECT, did not meet the criteria for emotional maltreatment and did not meet the criteria for entry into the DoD Central Registry database.



File No: 303-C-128-B--33977181031354

2-15. On 3 May 18, SA TINNELL reviewed VPD Supplemental Report for case number 2017-08155 (Exhibit 6). The review disclosed the following information: On 30 Nov 17, Officer SPENCER, VPD, Vacaville, CA, (Agent Note: The report did not identify SPENCER's first name) met with VICTIM after she contacted VPD to add additional information to case number 2017-08155. SPENCER met with VICTIM who reported on 11 Oct 17, she and SUBJECT were in bed at their shared residence. VICTIM attempted to talk to SUBJECT, who continually ignored her. VICTIM gave up speaking to SUBJECT and went to the guest bedroom, the room SUBJECT preferred to sleep in, and got into bed. Sometime later, SUBJECT came to the guest bedroom and got into bed. SUBJECT pivoted on his buttocks and kicked her in the right hip with both of his feet. VICTIM flew from the bed and rolled into the closet door. VICTIM reported to SPENCER that she did not know if she had been physically injured during the physical altercation.

2-16. On 3 May 18, SA TINNELL reviewed VICTIM's letter to The Honorable HEATHER WILSON, SECAF, Pentagon, Arlington, VA (Exhibit 7). The review disclosed the following information: VICTIM reported between December 2017 and October 2017, she suffered verbal/emotional and physical abuse by SUBJECT. Among the physical abuse, SUBJECT grabbed VICTIM three times, tossed VICTIM around twice, wrapped his hands around her neck and would not let go immediately, and kicked VICTIM into closet doors, grabbed her hair three times, and pushed VICTIM on the floor. In the letter, VICTIM reported SUBJECT caused her to have a miscarriage, but because she did not see a doctor, she was informed the miscarriage should not be mentioned to law enforcement.

2-17. On 7 May 18, SA TINNELL reviewed body cam footage obtained by VPD during the incident on 11 to 12 Oct 17, regarding VPD's traffic stop of SUBJECT. The review disclosed the following information: SUBJECT disclosed to VPD that he and VICTIM had a heated argument and he decided to leave. SUBJECT started getting his uniform and other items so that he could go to work the next day. VICTIM threatened to call the police if he left and took a photo of his license plate. SUBJECT left and was pulled over shortly afterward by VPD. VPD searched SUBJECT with his consent to ensure he did not have any weapons on him or in his vehicle. They found uniforms and clothes. SUBJECT appeared slightly upset about the situation, but calmly answered VPD's questions throughout the entirety of the interaction. When VPD informed SUBJECT that VICTIM was reporting injuries, SUBJECT responded that he and VICTIM made physical contact via wrestling, because she knocked his computer out of his hand. When VPD asked if VICTIM would hurt herself to prove a point, SUBJECT replied that he would not rule anything out. SUBJECT reported VICTIM threw her phone at a bedroom door and informed SUBJECT she was going to tell the police he did it and VICTIM also threatened to overdose on sleeping pills on three separate occasions. SUBJECT was advised of his Miranda rights by VPD. SUBJECT stated they got into an argument because VICTIM had a lot of male friends. Starting around 1900 hours, SUBJECT and VICTIM got into the argument, which continued off and on throughout the night. SUBJECT attempted to go to bed in the spare bedroom. VICTIM followed him, so he went into the third bedroom to sleep. SUBJECT grabbed his computer, VICTIM grabbed it from him. SUBJECT then reached out to get his computer back and pulled it away from her. SUBJECT began to collect his stuff so he could leave. VICTIM began blocking doorways and hung onto him as he walked up and down the stairs. SUBJECT pushed past her and grabbed her shoulders to move her so that he could finish packing. SUBJECT did not remember pulling VICTIM's hair but said it might have happened while he was moving her. SUBJECT informed VPD he did not have any injuries to report. SUBEJCT did not provide any information regarding VICTIM stating she was pregnant.

FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE



File No: 303-C-128-B--33977181031354

2-18. On 7 May 18, SA TINNELL reviewed body cam footage obtained by VPD during the 11 to 12 Oct 17 incident, regarding VICTIM's initial contact at her residence. The review disclosed the following information: VICTIM informed VPD this was the fifth time her and SUBJECT had a physical altercation, but did not explain what that meant. VICTIM pointed out a bruise on her right upper arm, a red mark on her left elbow, and stated her hair was pulled and she had scratches on her knees. VICTIM informed VPD that SUBJECT had been mean to her over the past couple of days, but was not physical with her. VICTIM did not think VPD would come, because she attempted to cancel the 911 call. SUBJECT and VICTIM got into a verbal altercation, but did not describe the conversation. VICTIM informed VPD that she did not want them to come to her residence. VPD informed VICTIM that she called 911 and claimed SUBJECT had kicked her and pulled her hair. VICTIM declined to press charges or obtain a protective order. VICTIM stated she had threatened SUBJECT with calling the police in the past and decided to do so because he had called her bad names. When VPD informed VICTIM they found SUBJECT before arriving at VICTIM's location, SUBJECT informed then he had tried to leave and she would not let him do so. When VPD added that SUBJECT had his clothing packed in the vehicle, VICTIM responded she felt VPD was trying to get her to tell them something she did not want to tell them. (Note: Due to the poor quality of the camera footage, VICTIM's bruise on her right arm was difficult to see (Exhibit 8). VICTIM declined to show them any other injuries. VPD did not take photos. VICTIM did not provide any details regarding a pregnancy.

2-19. On 8 May 18, SA TINNELL reviewed body cam footage obtained by VPD on 30 Nov 17, regarding VICTIM's supplemental report. The review disclosed VICTIM wanted to report more information to VPD. (Agent Note: Only the request to report the information via telephone was recorded. Nothing regarding VICTIM's report was recorded. Ref para 2-15.)

2-20. On 8 May 18, SA TINNELL reviewed AF Form 3545, Incident Report: I1712-01V (Exhibit 9) on file with the 60 SFS, TAFB, CA. The review disclosed the following information: The investigation began on 13 Nov 17, following VICTIM admittance to DGMC for medical evaluation related to a verbal altercation with SUBJECT. During a FAP intake with MARTINEZ, VICTIM disclosed she was kicked in the stomach and her hair was pulled by SUBJECT. VICTIM reported the matter to VPD but declined charges.

GARLICK was contacted and initiated an investigation. During SFS investigation, they obtained the VPD report I1712-01V, VICTIM written statement, three VPD bodycam videos (ref para 2-17, 2-18, and 2-19), and text messages provided by VICTIM (ref par 2-23). A coordination with CIV CARRIE GYLLING, Solano County Deputy District Attorney, Fairfield, CA, disclosed they would not be prosecuting SUBJECT (regarding the VPD report) due to a lack of evidence. The SFS investigation was turned over to AFOSI on 12 Apr 18, upon VICTIM's notification to AFOSI she miscarried due to being assaulted by SUBJECT. The SFS report did not contain any mention of miscarriage or pregnancy reported by VICTIM.

2-21. On 9 May 18, SA TINNELL coordinated with GARLICK, regarding their investigation, case number I20180300135/I1712-01VW. VICTIM never informed GARLICK about a pregnancy or miscarriage. GARLICK stated if she had, he would had forwarded the information to AFOSI Det 303 as he had done in the past with similar investigations. VICTIM's interview was not recorded, but Maj



File No: 303-C-128-B--33977181031354

BRENT JONES, Senior Trial Counsel, Western Circuit, 60 AMW, TAFB, CA, was present for the interview (ref para 2-22).

2-22. On 9 May 18, SA TINNELL coordinated with JONES regarding this investigation. JONES stated VICTIM contacted him on LinkedIn (Agent Note: LinkedIn was a social media site for developing professional connections and job recruitment) in December 2017. VICTIM wanted to report physical and mental abuse. JONES obtained VICTIM's phone number and called her. He made sure VICTIM was safe and offered to assist her in meeting with AFOSI and SFS. On 3 Jan 18, JONES met VICTIM on TAFB and escorted her to AFOSI and SFS to report the abuse. VICTIM did not mention a pregnancy or miscarriage to AFOSI or SFS. When the information provided to AFOSI did not meet their purview, VICTIM met with SFS, where an investigation was opened. JONES remembered hearing about the miscarriage later on, but could not remember if VICTIM ever mentioned it to him. JONES did not remember where he heard about the miscarriage or what details were provided to him.

2-23. On 10 May 18, SA TINNELL reviewed of VICTIM's text messages provided to SFS (Exhibit 10). The review disclosed the following information: VICTIM never informed anyone about a miscarriage. VICTIM made several mentions of SUBJECT assaulting her on 11 Oct 17, but did not provide details. VICTIM did not press charges nor did she request a restraining order against SUBJECT. VICTIM did not provide any photographs or provide direct details regarding any of the assaults. VICTIM referenced SUBJECT bringing his hands up to her face and threatening to strike her (ref para 2-7).

2-24. On 11 May 18, SA TINNELL reviewed the LinkedIn private messages provided by JONES (Exhibit 11). The review disclosed the following information: On 22 Dec 17, VICTIM contacted JONES via private message (time stamped at 1213 hours) and asked if he was able to give legal advice, practiced law outside of the Air Force, or could give him a referral. JONES replied he could give general advice and point VICTIM in the right direction. At a timestamp of 1430 hours the same day, VICTIM thanked JONES for his help.

2-25. On 15 May 18, SA TINNELL interviewed FORTIER at AFOSI Det 303, TAFB, CA. FORTIER verbally provided the following information: FORTIER never met VICTIM in person, but did speak to her over the phone during December 2017 through February 2018. FORTIER believed VICTIM started coming to FAP sometime late 2017 and alleged SUBJECT had physically and emotionally abused her during their relationship. VICTIM did not bring up a miscarriage in the beginning of her sessions. When VICTIM did bring up a miscarriage, FORTIER believed VICTIM did not state anyone caused the miscarriage. MARTINEZ was VICTIM's FAP counselor who would have more information regarding their different sessions. Something that was noted within the documentation was that VICTIM would give her accounts of a session and it would change each time she gave the story. When she spoke about the assault on 11 Oct 17, VICTIM initially stated SUBJECT kicked her in the stomach, causing her to fly from the bed. Later she stated she was kicked in her buttocks, which caused her to leave the bed. After reviewing VPD reports and body cam footage, FORTIER learned VICTIM informed them it was her pelvis or leg he kicked. Due to policy, FORTIER could not discuss what was brought up during the CRB or why the CRB did not find in VICTIM's favor versus SUBJECT.

2-26. **SUBJECT INTERVIEW:** On 23 May 18, SA TINNELL and SA KRYSTIN BARNETT, AFOSI Det 303, TAFB, CA, interviewed SUBJECT at AFOSI Det 303, TAFB, CA. Subsequent to Article 31 Rights advisement for Article 119, Manslaughter, and Article 128, Assault, SUBJECT waived his rights



File No: 303-C-128-B--33977181031354

and verbally provided the following information: CARDIN met VICTIM on Tinder, a month prior to leaving HFLD, FL, during summer 2016. SUBJECT and VICTIM engaged in a sexual relationship prior to him leaving. After he arrived at TAFB, SUBJECT and VICTIM continued to text but never made any plans to meet or move the relationship forward. In late August 2016, VICTIM showed up at SUBJECT's door with a fruit basket. SUBJECT had not invited VICTIM, but could not turn her away and allowed her to stay the weekend. VICTIM and SUBJECT started speaking more and VICTIM visited SUBJECT two or three more times between August 2016 and early 2017. Around March 2017, VICTIM informed SUBJECT that she was coming to the end of her lease in April 2017. VICTIM gave SUBJECT the ultimatum that he let her move in with him or they were breaking up. SUBJECT decided to let VICTIM move in with him and he flew out in April 2017 to help move her to Vacaville, CA. While they were packing, VICTIM informed SUBJECT she needed to go to the doctor's office and asked if he would come. SUBJECT agreed and they drove an hour to a fertility clinic in Mobile, AL, whose name SUBJECT could not remember. VICTIM spoke with a male doctor, whose name SUBJECT could not remember, who stated if VICTIM wanted to have children, she needed to start trying to conceive in the next year or it would become significantly harder to conceive a child. SUBJECT felt as if he had been tricked into listening to the conversation so VICTIM could start hinting that she wanted children with him. After SUBJECT and VICTIM moved to Vacaville, they started arguing about different items. VICTIM would push SUBJECT's buttons and an argument would ensue. SUBJECT declined to comment on the specific arguments. SUBJECT declined to provide details regarding the night of 11 Oct 18. When SUBJECT left on 11 Oct 18, he did not talk to or see VICTIM much until 11 Nov 18, when he moved out of the house. SUBJECT did not believe VICTIM was ever pregnant. SUBJECT stated they only had intercourse 2-5 times in the six months because he suffered erectile dysfunction. Subsequent to listening to Recording 234 (ref para 2-6), SUBJECT requested a lawyer and the interview was terminated. SUBJECT declined to provide a written statement.

2-27. On 23 May 18, SA TINNELL obtained SUBJECT's photographs, DNA, and fingerprints in accordance with agency procedure.

2-28. On 1 Jun 18, SA TINNELL and SA PIERCE interviewed HOLWAY at AFOSI Det 303, TAFB, CA. HOLWAY verbally provided the following information: HOLWAY met SUBJECT sometime mid-2016 through work and VICTIM during December 2016 at a Christmas party. SUBJECT and VICTIM seemed happy at first and SUBJECT never complained to HOLWAY about VICTIM at work. Sometime mid-2017, after VICTIM moved in with SUBJECT, they began to have issues. SUBJECT never talked about his issues with VICTIM. VICTIM began texting HOLWAY in July 2017. VICTIM was concerned about SUBJECT due to the issues they were having, but never went into details. After SUBJECT left VICTIM in October or November 2017, VICTIM texted HOLWAY and threatened to turn SUBJECT in to his leadership for what he had done to her, if SUBJECT did not contact her. VICTIM wanted HOLWAY to pass on the message to SUBJECT. HOLWAY called VICTIM and asked her exactly what SUBJECT had done to her. VICTIM replied nothing and that she was worried about him because he was unstable. VICTIM mentioned financial and mental health issues, but never provided any details as to what she meant. HOLWAY asked VICTIM if SUBJECT had done anything to hurt her or if he had violated any laws to include the UCMJ. VICTIM replied SUBJECT had not. VICTIM mentioned a miscarriage occurred, but did not provide details. When HOLWAY reached out to SUBJECT to check on him, he passed on the information VICTIM provided him. SUBJECT declined to provide any additional information to HOLWAY. HOLWAY did not push for additional details. HOLWAY declined to provide a written statement.



File No: 303-C-128-B--33977181031354

2-29. On 5 Jun 18, SA TINNELL reviewed e-mails (██████████/erik.cardin@us.af.mil) and text messages provided by SUBJECT on a CD, via signed consent, between himself and VICTIM (Exhibit 12). The review disclosed the following information:

On 13 Oct 17 at 1003 hours, VICTIM e-mailed SUBJECT with a subject line of "Going to Er." The e-mail read, "I really wish you would have listened to me." (Agent Note: The statement contradicted what VICTIM previous stated, that she never sought any medical treatment after their incident.)

On 8 Nov 17, VICTIM texted SUBJECT: "Your arms wrapped around me at night, fit so perfectly and the way so many people commented on the beautiful kids would have (sic)."

On 11 Nov 17, SUBJECT texted VICTIM to inform her that he had people to coming to the house to obtain help him move out as well as letting her know what bills were paid. VICTIM responded with multiple text telling SUBJECT he could not do so. VICTIM informed SUBJECT she would get a no contact order, support the District Attorney (DA) so SUBJECT would get a misdemeanor and not be allowed to have guns, and call OSI so that SUBJECT would be reprimanded. VICTIM had one text message to SUBJECT that read, "And the baby…i wont forget." No context was provided to explain the message.

No mention was made of a miscarriage, SUBJECT causing VICTIM to have a miscarriage and no mention was made of VICTIM being pregnant.

2-30. On 6 Jun 18, SA PIERCE and INV DUTCHER interviewed VICTIM at AFOSI Det 303, TAFB, CA. SA PIERCE provided VICTIM with an AF FM 2701 and offered support services. VICTIM declined support services at the time. VICTIM expressed her concerns about the investigative process and wanted to know SUBJECT's status. SA PIERCE informed VICTIM there was an ongoing investigation and that he could not provide details regarding the investigation.

2-31. On 2 Jul 18, SA TINNELL, AFOSI Det 303, TAFB, CA, interviewed MARTINEZ who verbally provided the following information: MARTINEZ met VICTIM and SUBJECT as their FAP counselor shortly after 11 Nov 17, through a mental health referral. VICTIM stated there was tension between her and SUBJECT. VICTIM and SUBJECT had a verbal argument in their bedroom on the evening of 11 Oct 17. SUBJECT went to the art room to avoid additional conflict. VICTIM informed MARTINEZ they had two bedrooms, so that when a verbal altercation occurred, both VICTIM and SUBJECT could sleep separately at night. SUBJECT exited the art room and entered the bedroom where VICTIM was lying on the bed. SUBJECT got into bed and applied both feet to VICTIM'S left buttocks and kicked her off the bed. VICTIM landed on her feet and steadied herself against the closet to stand up. When MARTINEZ spoke to SUBJECT, he denied kicking VICTIM off the bed. SUBJECT then left the bedroom, entered the hallway, and entered the music room where he sat on the bed. SUBJECT then opened a laptop to watch a movie. Shortly after, VICTIM exited the bedroom and entered the music room to try to talk to SUBJECT. VICTIM took two fingers to lower the lid of the laptop to get SUBJECT'S full attention SUBJECT and VICTIM began fighting over the control of the laptop. VICTIM stated SUBJECT grabbed her hair. SUBJECT stated he grabbed VICTIM's hair while trying to grab her collar to move her.



File No: 303-C-128-B--33977181031354

VICTIM did not seek medical assistance, but might have sought counseling outside. MARTINEZ did not know whom VICTIM went to obtain counseling (Agent Note: VICTIM reported to AFOSI she did not seek counseling outside of FAP). SUBJECT informed MARTINEZ, a friend received information from VICTIM, that she had a miscarriage. MARTINEZ did not know the name of the friend. SUBJECT stated VICTIM had not been pregnant and did not have a miscarriage, but did not go into detail. When MARTINEZ spoke to VICTIM, she was surprised SUBJECT brought up the miscarriage. VICTIM stated a miscarriage occurred, but did not provide details regarding the miscarriage other than one occurred. MARTINEZ coordinated with FORTIER regarding reporting procedures about the miscarriage. Since they had no information regarding anyone causing the miscarriage, FAP did not report the incident to AFOSI.

MARTINEZ' last meeting with VICTIM and SUBJECT occurred in November or December 2017. MARTINEZ had not been in contact with either SUBJECT or VICTIM since then. Over the course of MARTINEZ' professional interaction, MARTINEZ officially met with VICTIM four times and SUBJECT two times.

Agent Note: A signed DD Form 2870, Medical Release, by SUBJECT and VICTIM was provided along with a Health Insurance Portability and Accountability Act (HIPAA) memorandum, in order to interview MARTINEZ.

2-32. On 24 Jul 18, SA TINNELL reviewed the Inspector General (IG) Personal and Fraud, Waste & Abuse Complaint Registration Form, AF Form 102, dated 1 Feb 18 (Exhibit 13), provided by INV ANDREW WRIGHT, IG, 60 AMW, TAFB, CA. The review disclosed the following information: VICTIM registered a complaint regarding the outcome and the method used to come to the outcome of the CRB results. The form did not have any references to a miscarriage.

2-33. On 24 Jul 18, SA TINNELL reviewed of the IG Analysis regarding VICTIM's complaint (Exhibit 14), provided by WRIGHT. The review disclosed the following information: IG's resolution path was that it had been determined that no wrong-doing occurred in the matter regarding the outcome and the method used to come to the outcome of the CRB results. The analysis did not discover or contain any references to a miscarriage.



File No: 303-C-128-B--33977181031354

## 3-1. EXHIBITS

The following items are appended to this report (cross-referenced):

1. AF IMT 1168 – VICTIM (Paragraph 2-3)
2. Vacaville Police Department Report (Paragraph 2-9)
3. VICTIM's Congressional Request for Congressional Inquiry (Paragraph 2-10)
4. VICTIM's Letter to Family Advocacy Program (Paragraph 2-11)
5. Central Registry Board Determinations (Paragraph 2-5)
6. Vacaville Police Department Supplemental Report (Paragraph 2-15)
7. VICTIM's Letter to SECAF (Paragraph 2-16)
8. Photograph of VICTIM's Arm – VPD Body Cam (Paragraph 2-18)
9. Security Forces Report (Paragraph 2-20)
10. VICTIM provided Text Messages (Paragraph 2-23)
11. JONES LinkedIn Messages (Paragraph 2-24)
12. SUBJECT Provided E-Mails and Text Messages (Paragraph 2-29)
13. Inspector General – AF Form 102 (Paragraph 2-32)
14. Inspector General – Analysis (Paragraph 2-33)



File No: 303-C-128-B--33977181031354

---

**EVIDENCE**

4-1   The following is a list of evidence associated with this investigation (cross-referenced):

Obtained at:   AFOSI Det 303, 510 Airlift Circle, Building 380B, 2nd Floor, Travis AFB, CA 94535
Obtained on:   23 Apr 18
Obtained by:   JOHNSON, PAXTEN D
Agent(s):      SA TINNELL (LEAD)
RCVD From:     BRUEGGEMANN

**33977181031414-1:**   One black and silver in color, 32 GB Gigastone data stick containing three recordings between CARDIN and OLSZEWSKI, marked "PDJ 23 Apr 18." Item received in envelope marked AG 3 Jan 18 1300. Condition all items: Used.



File No: 303-C-128-B--33977181031354

EXHIBIT 1

AF IMT 1168 – VICTIM (Paragraph 2-3)